**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
E-mail: jpafiti@pomlaw.com
*- additional counsel on signature page -*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL WITTEN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>GOLDCORP INC., CHARLES A. JEANNES, LINDSAY A. HALL, DAVID GAROFALO, and RUSSELL BALL,<br><br>Defendants | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff Michael Witten ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through

1

Plaintiff's attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Goldcorp Inc. ("Goldcorp" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired common shares of Goldcorp between March 31, 2014 and August 24, 2016, both dates inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

2

3.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.     Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

5.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.     Plaintiff, as set forth in the accompanying Certification, purchased common shares of Goldcorp at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.     Defendant Goldcorp engages in the acquisition, exploration, development, and operation of precious metal properties in Canada, the United States, Mexico, and Central and South America. The Company primarily explores for gold, silver, lead, zinc, and copper. The Company is incorporated in Ontario, Canada with principal executive offices located at Suite 3400 — 666 Burrard Street, Vancouver, British Columbia, V6C 2X8 Canada. Goldcorp common shares are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "GG".

3

8. Defendant Charles A. Jeannes ("Jeannes") served as Chief Executive Officer ("CEO") and President of GoldCorp from January 1, 2009 until February 29, 2016.

9. Defendant Lindsay A. Hall ("Hall") served as Chief Financial Officer ("CFO") of GoldCorp from April 19, 2006 until March 9, 2016 and also served as the Company's Executive Vice President from March 3, 2006 until March 9, 2016.

10. Defendant David Garofalo ("Garofalo") has served as President and CEO of Goldcorp since February 29, 2016.

11. Defendant Russell Ball ("Ball") has served as CFO and Executive Vice President of Corporate Development of Goldcorp since March 9, 2016.

12. Defendants Jeannes, Hall, Garofalo, and Ball are sometimes referred to herein as the "Individual Defendants."

13. Each of the Individual Defendants:

    (a) directly participated in the management of the Company;

    (b) was directly involved in the day-to-day operations of the Company at the highest levels;

    (c) was privy to confidential proprietary information concerning the Company and its business and operations;

4

(d)    was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)    was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)    was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)    approved or ratified these statements in violation of the federal securities laws.

14.    Goldcorp is liable for the acts of the Individual Defendants and its employees under the doctrine of respondeat superior and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Goldcorp under respondeat superior and agency principles.

16.    Defendant Goldcorp and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

17.    The Peñasquito gold-silver-lead-zinc mine (the "Peñasquito Mine") is wholly-owned by Goldcorp.

18.    The Peñasquito Mine is located in north-central Mexico and is considered by Goldcorp to be a material mineral property.

### Materially False and Misleading Statements

19.    On March 31, 2014, after the market closed, the Company filed a Form 40-F for the fiscal year ended December 31, 2013 (the "2013 40-F") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2013. The 2013 40-F was signed by Defendant Jeannes. The 2013 40-F also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Jeannes and Hall attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

20.    Goldcorp's Annual Information Form for the financial year ended December 31, 2013, attached as Exhibit 99.1 to the 2013 40-F, provided updates on the operations at the Peñasquito Mine and stated that "Goldcorp's mining and processing

operations and exploration and development activities are currently carried out in accordance with all applicable rules and regulations", stating in pertinent part:

### Updated Technical Report for Peñasquito Mine

On January 8, 2014, Goldcorp announced that an updated NI 43-101 technical report had been filed for the Peñasquito Mine. As detailed in the technical report, the 2014 and five-year production profile has been positively affected by the revised mine plan. The report indicates increased cash flows over the life of the mine, supporting the current carrying value of the Peñasquito Mine cash-generating unit. It also includes a reduction to the projected mine life from 19 years to 13 years because the final two phases of the previous ultimate pit and lower-grade mineralized material will not be mined or processed under current assumptions. A commensurate reduction in the Mineral Reserve estimates has resulted. The higher strip ratio pushbacks and lower-grade material requiring higher commodity prices to be economically processed has been re-classified as Mineral Resources

* * *

*Hydrogeological Drilling*

A number of water wells have been completed in support of supply of the Peñasquito Mine's water needs.

* * *

The Peñasquito Mine operation was reviewed in 2013. The following deviations from the 2008 feasibility study assumptions, based on third quarter 2013 data, were noted:

- Changes to metal price and exchange rate assumptions;
- Changes to the value estimation methodology used in the Mineral Resource block model;
- Updates to the pit shell assumptions used in pit optimization;

7

- Updates, based on the current knowledge of processing and treatment costs, of the cut-off grade used to determine material sent to either the low-grade stockpile or the waste rock storage facilities;
- Updates to the mine plan such that only material with a low strip-ratio is considered to be mineable whereas previous studies have higher strip-ratio material included in the mine plan;
- Detailed plant throughput data on a fully representative set of production data indicated that the block-scale mineralogical variability was not captured at the sampling spacing available during the feasibility studies. Grade of payable elements was acceptable; however, there were some selective mining unit blocks that had significantly elevated potentially deleterious and penalty-incurring elements. This has resulted in a number of blocks falling below the current economic threshold used for the Mineral Reserves;
- Identification of these higher-penalty selective mining unit blocks has required modifications to in-pit sequencing and mine design so that the material is either not mined at all, or is sent to waste, or is sent to the low-grade stockpile;
- Updates to metallurgical recovery assumptions. Earlier studies had assumed fixed recoveries, and these assumptions were replaced in 2013 by a set of recovery equations based on actual plant performance;
- Updates to the assumptions regarding treatment and refining costs; prior to 2013, these were assumed to be fixed;
- Changes to the classifications used for concentrates, such that there are five concentrate types in 2013;
- Updates to operating and general and administrative costs from 2006 to 2013;
- Updates to sustaining capital cost estimates from 2006 to 2013;
- Imposition by the Mexican authorities of a royalty on precious metals production from January 2014;

8

- Changes by the Mexican authorities to the taxation regime from January 2014; and
- Capital costs and operating costs for additional water infrastructure to support mine water supply and for the second tailings storage facility.

As a consequence, the estimates for the Mineral Resources and Mineral Reserves were revised, as documented in the Peñasquito Report. The mine plan was rescheduled based on the estimated Mineral Reserves available.

### Mining Operations

### Mining Method

Mine production during the first three quarters of 2013 was 167.2 million metric tonnes. For 2014, the throughput rate selected was based on the assumption that a 110 kilotonnes per day operation can be sustained using the available water well field. From 2015 onwards the operation is expected to benefit from the availability of a new water pipeline and the mine schedule reflects a throughput rate of 115 kilotonnes per day for the remainder of the mine life. The current mine plan is based on the 2013 Mineral Reserve estimates, and will produce oxide and sulphide material to be processed through the existing heap leach facility and sulphide plant respectively over a 13-year mine life (2014 to 2026). Material movement peaks in 2014 with 637,807 kilotonnes, decreasing to 179,646 kilotonnes in the last year of operation in 2026.

* * *

### Government Regulation

The mining, processing, development and mineral exploration activities of Goldcorp are subject to various laws governing prospecting, development, production, taxes, labour standards and occupational health, mine safety, toxic substances, land use, water use, land claims of local people and other matters. Although **Goldcorp's mining and processing operations and**

9

**exploration and development activities are currently carried out in accordance with all applicable rules and regulations**…

\* \* \*

*Environmental Risks and Hazards*

Goldcorp's operations are subject to environmental regulation in the various jurisdictions in which it operates. These regulations mandate, among other things, the maintenance of air and water quality standards and land reclamation. They also set out limitations on the generation, transportation, storage and disposal of solid and hazardous waste. Environmental legislation is evolving in a manner which will likely, in the future, require stricter standards and enforcement, increased fines and penalties for non-compliance, more stringent environmental assessments of proposed projects and a heightened degree of responsibility for companies and their officers, directors and employees. There is no assurance that future changes in environmental regulation, if any, will not adversely affect Goldcorp's results of operations. Failure to comply with these laws, regulations and permitting requirements may result in enforcement actions, including orders issued by regulatory or judicial authorities causing operations to cease or be curtailed, and may include corrective measures requiring capital expenditures, installation of additional equipment, or remedial actions. Parties engaged in mining operations or in the exploration or development of mineral properties may also be required to compensate those suffering loss or damage by reason of the mining activities and may have civil or criminal fines or penalties imposed for violations of applicable laws or regulations. The occurrence of any environmental violation or enforcement action may have an adverse impact on Goldcorp's reputation.

[Emphasis added].

10

21.     Goldcorp's Management's Discussion and Analysis of Financial Condition and Results of Operations for the year ended December 31, 2013, attached as Exhibit 99.2 to the 2013 40-F, provided updates on the water wells near the Peñasquito Mine, stating in pertinent part:

> Peñasquito continued to incrementally increase its fresh water production in 2013 from 69,500 to 77,000 cubic metres per day with the addition of eight new wells in the Torres-Vergel area and four new wells in the mine area. These new wells not only supplied water to replace the declining production in the existing well field, but allowed water production to increase above 2012 year end levels. This increase in water production combined with rigorous control of tailings management and improved efficiencies in the primary crusher and augmented feed circuit, allowed an increase in plant throughput from 99,945 tonnes per day in 2012 to 106,200 tonnes per day in 2013.

> * * *

> Failure to comply strictly with applicable laws, regulations and local practices relating to mineral right applications and tenure, could result in loss, reduction or expropriation of entitlements, or the imposition of additional local or foreign parties as joint venture partners with carried or other interests. The occurrence of these various factors and uncertainties cannot be accurately predicted and could have a material adverse effect on the Company's operations or profitability.

22.     On March 18, 2015, the Company filed a Form 40-F for the fiscal year ended December 31, 2014 (the "2014 40-F") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were

effective as of December 31, 2014. The 2014 40-F was signed by Defendant Jeannes. The 2014 40-F also contained signed SOX certifications by Defendants Jeannes and Hall attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

23.   Goldcorp's Annual Information Form for the financial year ended December 31, 2014, attached as Exhibit 99.1 to the 2014 40-F, provided updates of the operations at the Peñasquito Mine and stated that "Goldcorp's mining and processing operations and exploration and development activities are currently carried out in accordance with all applicable rules and regulations", stating in pertinent part:

> Process and potable water for the Peñasquito Mine is sourced from the Torres-Vergel well field located six kilometres west of the Peñasquito Mine and permits to pump up to 35 million cubic metres per year from this source have been received. The existing supply of groundwater is not sustainable in the long term and has resulted in a reduction of plant throughput since 2013 due to lower than planned volumes from the current infrastructure. In 2012 and 2013, expansion to the current Torres–Vergel well field occurred. To allow plant production to return to design levels, an additional groundwater source within the Cedros basin has been identified. This area is named the Northern Well Field, and is approximately 60 kilometres northwest of the Peñasquito Mine and construction took place during 2014 and is anticipated to be completed in mid-2015. Once complete, the Northern Well Field is expected to meet the long-term water requirements for the Peñasquito Mine.

> * * *

> **_Government Regulation_**

12

The mining, processing, development and mineral exploration activities of Goldcorp are subject to various laws governing prospecting, development, production, taxes, labour standards and occupational health, mine safety, toxic substances, land use, water use, land claims of local people and other matters. Although **Goldcorp's mining and processing operations and exploration and development activities are currently carried out in accordance with all applicable rules and regulations**…

\* \* \*

*Environmental Risks and Hazards*

Goldcorp's operations are subject to environmental regulation in the various jurisdictions in which it operates. These regulations mandate, among other things, the maintenance of air and water quality standards and land reclamation. They also set out limitations on the generation, transportation, storage and disposal of solid and hazardous waste. Environmental legislation is evolving in a manner which will likely, in the future, require stricter standards and enforcement, increased fines and penalties for non-compliance, more stringent environmental assessments of proposed projects and a heightened degree of responsibility for companies and their officers, directors and employees. Recent occurrences of tailings dam failures may increase the likelihood that these stricter standards and enforcement mechanisms will be implemented in the future. There is no assurance that future changes in environmental regulation, if any, will not adversely affect Goldcorp's results of operations. Failure to comply with these laws, regulations and permitting requirements may result in enforcement actions, including orders issued by regulatory or judicial authorities causing operations to cease or be curtailed, and may include corrective measures requiring capital expenditures, installation of additional equipment, or remedial actions. Parties engaged in mining operations or in the exploration or development of mineral properties may also be required to compensate those suffering loss or damage by

reason of the mining activities and may have civil or criminal fines or penalties imposed.

24.     Goldcorp's Management's Discussion and Analysis of Financial Condition and Results of Operations for the year ended December 31, 2014, attached as Exhibit 99.2 to the 2014 40-F, provided updates of the operations at the Peñasquito Mine, stating in pertinent part:

> Permitting delays experienced in the first quarter of 2014 due to unanticipated additional regulatory requirements related to the interconnection with the existing well fields, securing surface land access rights, and additional permitting requirements by the environmental authority deferred start-up of construction of the Northern Well Field ("NWF") project at Peñasquito to mid-year 2014. Following receipt of initial permits and finalizing the remaining construction contracts, construction on the NWF project ramped up to full activity levels in the fourth quarter of 2014, with completion anticipated around mid-year 2015. Activities to address the additional regulatory requirements related to the interconnection to the existing well field continue as planned. Contingency plans remain in place for fresh water supply to Peñasquito until the NWF is operational.

> * * *

> Failure to comply strictly with applicable laws, regulations and local practices relating to mineral right applications and tenure, environmental requirements, land and water use, could result in loss, reduction or expropriation of entitlements, or the imposition of additional local or foreign parties as joint venture partners with carried or other interests. The occurrence of these various factors and uncertainties related to the economic and political risks of operating in foreign jurisdictions cannot be accurately predicted and could have a material adverse effect on the Company's operations or profitability. In addition to internal controls, systems and processes, the Company mitigates these risks by building positive, sustainable

14

relationships with local communities, vendors, and local, regional, and federal governments, maintaining ongoing and transparent communication with stakeholders, a commitment to sustainability, and best practices in corporate governance.

25.    On March 30, 2016, the Company filed a Form 40-F for the fiscal year ended December 31, 2015 (the "2015 40-F") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of December 31, 2015. The 2015 40-F was signed by Defendant Garofalo. The 2015 40-F also contained signed SOX certifications by Defendants Garofalo and Ball attesting to the accuracy of financial reporting, the disclosure of any material to the Company's internal controls over financial reporting, and the disclosure of all fraud.

26.    Goldcorp's Annual Information Form for the financial year ended December 31, 2015, attached as Exhibit 99.1 to the 2015 40-F, provided updates of the operations at the Peñasquito Mine and stated that Goldcorp's "mining and processing operations and exploration and development activities are currently carried out in accordance with all applicable rules and regulations", stating in pertinent part:

> Process and potable water for the Peñasquito Mine is sourced from the Torres-Vergel well field located six kilometres west of the Peñasquito Mine. An additional groundwater source within the Cedros basin has been identified. This area is named the Northern Well Field, and is approximately 60 kilometres northwest of the Peñasquito Mine and construction is anticipated to be completed in late Q3-2016. The Northern Well Field construction project was delayed 10 months in 2015 due to community concerns, and we expect that the parties will

15

resolve the dispute and the project will be completed in late 2016. Contingency plans remain in place to ensure fresh water supply to the mine continues unimpeded until the Northern Well Field is fully operational.

\* \* \*

*Government Regulation*

Our mining, processing, development and mineral exploration activities are subject to various laws governing prospecting, development, production, taxes, labour standards and occupational health, mine safety, toxic substances, land use, water use, land claims of local people and other matters. Although **our mining and processing operations and exploration and development activities are currently carried out in accordance with all applicable rules and regulations…**

\* \* \*

*Environmental Risks and Hazards*

Our operations are subject to environmental regulation in the various jurisdictions in which we operate. These regulations mandate, among other things, the maintenance of air and water quality standards and land reclamation. They also set out limitations on the generation, transportation, storage and disposal of solid and hazardous waste. Environmental legislation is evolving in a manner which will likely, in the future, require stricter standards and enforcement, increased fines and penalties for non-compliance, more stringent environmental assessments of proposed projects and a heightened degree of responsibility for companies and their officers, directors and employees. Recent occurrences of tailings dam failures may increase the likelihood that these stricter standards and enforcement mechanisms will be implemented in the future. There is no assurance that future changes in environmental regulation, if any, will not adversely affect our results of operations. Failure to comply with these

16

laws, regulations and permitting requirements may result in enforcement actions, including orders issued by regulatory or judicial authorities causing operations to cease or be curtailed, and may include corrective measures requiring capital expenditures, installation of additional equipment, or remedial actions. Parties engaged in mining operations or in the exploration or development of mineral properties may also be required to compensate those suffering loss or damage by reason of the mining activities and may have civil or criminal fines or penalties imposed for violations of applicable laws or regulations. The occurrence of any environmental violation or enforcement action may have an adverse impact on our reputation.

[Emphasis added].

27.     Goldcorp's Management's Discussion and Analysis of Financial Condition and Results of Operations for the year ended December 31, 2015, attached as Exhibit 99.2 to the 2015 40-F, provided updates of the operations at the Peñasquito Mine, stating in pertinent part:

Construction on the Northern Well Field ("NWF") resumed during the fourth quarter of 2015 following prior suspension of construction due to an illegal blockade by a local community. Completion of the NWF is now expected to be in late 2016. Contingency plans remain in place to ensure that fresh water supply to the mine continues unimpeded until the NWF is fully operational.

Peñasquito's open pit operations contained 10.17 million ounces of proven and probable gold reserves at December 31, 2015 compared to 10.54 million ounces at December 31, 2014 (refer to mineral reserve and resource tables for additional information), principally due to mining depletion, partially offset by positive remodeling of the block model based on new drill data.

* * *

> Failure to comply strictly with applicable laws, regulations and local practices relating to mineral right applications and tenure, environmental requirements, land and water use, could result in loss, reduction or expropriation of entitlements, or the imposition of additional local or foreign parties as joint venture partners with carried or other interests. The occurrence of these various factors and uncertainties related to the economic and political risks of operating in foreign jurisdictions cannot be accurately predicted and could have a material adverse effect on the Company's operations or profitability. In addition to internal controls, systems and processes, the Company mitigates these risks by building positive, sustainable relationships with local communities, vendors, and local, regional, and federal governments, maintaining ongoing and transparent communication with stakeholders, a commitment to sustainability, and best practices in corporate governance.

28.     The statements referenced in ¶¶ 19 – 27 above were materially false and/or misleading because they misrepresented and/or failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) levels of the mineral selenium had risen in one groundwater monitoring well near the Peñasquito Mine as early as October 2013; (ii) in October 2014, Goldcorp reported a rise in selenium levels in groundwater to the Mexican government after the contamination near the Peñasquito Mine waste facility intensified; (iii) in August 2016, Goldcorp told Mexican regulators that contaminated water had also been found in other areas near the Peñasquito Mine;

and (iv) as a result, Goldcorp's public statements were materially false and misleading at all relevant times.

### **The Truth Emerges**

29.    On August 24, 2016, *Reuters* published an article entitled "Exclusive: Goldcorp struggles with leak at Mexican mine", stating that Mexican regulators are examining whether Goldcorp broke any regulations in its handling of a long-running leak of contaminated water at the Peñasquito Mine, stating in pertinent part:

**TOP NEWS | Wed Aug 24, 2016 12:13pm EDT**

**Exclusive: Goldcorp struggles with leak at Mexican mine**

By Allison Martell, Frank Jack Daniel and Noe Torres | TORONTO/MEXICO CITY

**Mexican regulators said they are examining whether mining company Goldcorp Inc (G.TO) broke any regulations in its handling of a long-running leak of contaminated water at Mexico's biggest gold mine.**

**The move follows questions from Reuters about the leak, which until now has not been disclosed to the public.**

**Levels of the mineral selenium rose in one groundwater monitoring well near Goldcorp's Penasquito mine as early as October 2013, Goldcorp data reviewed by Reuters shows.**

**The Canadian company reported a rise in selenium levels in groundwater to the Mexican government in October 2014, after which the contamination near its mine waste facility intensified, according to internal company documents seen by Reuters, and interviews with government officials. Two weeks ago, the company told Mexican regulators that**

19

**contaminated water had also been found in other areas of its property.**

\* \* \*

"We have managed the issue within the confines of our property and continue to monitor and operate our tailings management system to prevent any external impacts," Goldcorp said when asked when the leak was discovered and whether it was ongoing.

Selenium is sometimes released into the environment by mining and can be present in waste stored in what are known as tailings ponds. High concentrations in water can damage human health and cause deformities in wildlife. In recent years its effect on fish and waterbirds has led to successful lawsuits against North American miners including U.S.-based Patriot Coal, which filed for bankruptcy in 2012 under $443 million of selenium water treatment liabilities.

Vancouver-based Goldcorp declined to disclose how much it was spending to monitor and fix the leak, saying only that there was a "sufficient allocation of resources."

**"This issue is one that we have taken seriously and we are taking the necessary measures to resolve,"** said Michael Harvey, the miner's Latin America director for corporate affairs and security.

Two weeks ago, after receiving questions from Reuters, Goldcorp met with Mexican regulators in Zacatecas. A presentation dated March 2016 but delivered at that meeting said one of the steps the company was taking to address the leak was to relocate a pond that reclaims water from the tailings. The company told Reuters that project should be completed next year.

**HIGH SELENIUM LEVELS**

20

Selenium levels in the well rose for months after the miner alerted authorities in October 2014, the company data seen by Reuters shows. The concentration began falling in April 2015 and from September at least through January it was steady at 0.01 mg/liter.

Canadian province British Columbia, where Goldcorp is headquartered, and Mexico both establish maximum selenium concentrations of 0.01 mg per liter in drinking water. Mexico sets maximum concentrations of 0.008 mg/l in fresh water bodies and 0.02 mg/l in water for agricultural use. Levels in the groundwater at Penasquito rose to more than five times that level, the data shows.

* * *

**Profepa's Rodriguez told Reuters his unit was examining the case to see whether Goldcorp had downplayed or not fully disclosed relevant information.** He did not specify which regulations Goldcorp could have violated.

* * *

At the meeting with Profepa two weeks ago, Goldcorp described leaks in three other areas to the west and south of the facility, in addition to the original well. The company's presentation, seen by Reuters, showed that two of the leaks were just to the north of Las Mesas, a community of about 90 families who mostly raise cattle or grow corn and beans. Authorities in Las Mesas could not be reached for comment.

(Editing by Stuart Grudgings)

[Emphasis added].

30.    On this news, Goldcorp's share price fell $1.64, or approximately 9%, to close at $16.05 on August 24, 2016, damaging investors.

21

31.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Goldcorp common shares traded on the NYSE during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

33.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Goldcorp common shares were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Goldcorp or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

36.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of Goldcorp;
- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;
- whether the Individual Defendants caused Goldcorp to issue false and misleading SEC filings and public statements during the Class Period;
- whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;
- whether the prices of Goldcorp common shares during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

23

37.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

38.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Goldcorp common shares are traded in efficient markets;
- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;
- the Company traded on the NYSE, and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common shares; and
- Plaintiff and members of the Class purchased and/or sold Goldcorp common shares between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

39.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

24

40.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### <u>Against All Defendants</u>

41.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42.     This Count is asserted against Goldcorp and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

43.     During the Class Period, Goldcorp and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

44.     Goldcorp and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- •     employed devices, schemes and artifices to defraud;
- •     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- •     engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Goldcorp common shares during the Class Period.

45.    Goldcorp and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of Goldcorp were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of Goldcorp, their control over, and/or receipt and/or modification of Goldcorp allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Goldcorp, participated in the fraudulent scheme alleged herein.

46.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them

26

or other Goldcorp personnel to members of the investing public, including Plaintiff and the Class.

47. As a result of the foregoing, the market price of Goldcorp common shares was artificially inflated during the Class Period. In ignorance of the falsity of Goldcorp's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of Goldcorp common shares during the Class Period in purchasing Goldcorp common shares at prices that were artificially inflated as a result of Goldcorp's and the Individual Defendants' false and misleading statements.

48. Had Plaintiff and the other members of the Class been aware that the market price of Goldcorp common shares had been artificially and falsely inflated by Goldcorp's and the Individual Defendants' misleading statements and by the material adverse information which Goldcorp's and the Individual Defendants did not disclose, they would not have purchased Goldcorp's common shares at the artificially inflated prices that they did, or at all.

49. As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

50. By reason of the foregoing, Goldcorp and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which

they suffered in connection with their purchase of Goldcorp common shares during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

51.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52.    During the Class Period, the Individual Defendants participated in the operation and management of Goldcorp, and conducted and participated, directly and indirectly, in the conduct of Goldcorp's business affairs. Because of their senior positions, they knew the adverse non-public information regarding Goldcorp's business practices.

53.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Goldcorp's financial condition and results of operations, and to correct promptly any public statements issued by Goldcorp which had become materially false or misleading.

54.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Goldcorp disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their

28

power and authority to cause Goldcorp to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of Goldcorp within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Goldcorp common shares.

55.     Each of the Individual Defendants, therefore, acted as a controlling person of Goldcorp. By reason of their senior management positions and/or being directors of Goldcorp, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Goldcorp to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Goldcorp and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

56.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Goldcorp.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiff and the other members of the Class prejudgment and post- judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

**DEMAND FOR TRIAL BY JURY**

Plaintiff hereby demands a trial by jury.

Dated: August 26, 2016

Respectfully submitted,

**POMERANTZ LLP**

By: *s/ Jennifer Pafiti*
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:  (818) 532-6499
E-mail: jpafiti@pomlaw.com

**POMERANTZ, LLP**
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:(212) 661-8665
E-mail: jalieberman@pomlaw.com
E-mail: ahood@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
Ten South La Salle Street, Suite 3505
Chicago, Illinois 60603

Telephone:   (312) 377-1181
Facsimile:   (312) 377-1184
E-mail: pdahlstrom@pomlaw.com

**GOLDBERG LAW PC**
Michael Goldberg
Brian Schall
1999 Avenue of the Stars
Los Angeles, California 90067
Suite 1100
Telephone: 1-800-977-7401
Fax: 1-800-536-0065
Email:  michael@goldberglawpc.com
Email:  brian@goldberglawpc.com

*Attorneys for Plaintiff*